U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2016 JAN 19  PM 3: 19

CLE[

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 2:15-cr-88
)
MARCUS DELILLE )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS
(Doc. 14)

This matter came before the court on November 23, 2015 and December 7, 2015
for an evidentiary hearing on Defendant Marcus Delille's motion to suppress physical
evidence and statements (Doc. 14). On December 11, 2015, the parties completed their
post-hearing filings and the court took the motion under advisement.

Defendant is charged by Indictment with: Count One, possessing fifteen or more
counterfeit access devices, knowingly and with intent to defraud, in violation of 18
U.S.C. § 1029(a)(3); and Count Two, possessing five or more false identification
documents with intent to use, in violation of 18 U.S.C. § 1028(a)(3).

Defendant asserts that: (1) law enforcement unreasonably prolonged a traffic stop
of the vehicle he was operating without a reasonable suspicion of criminal activity; (2)
the traffic stop turned into a *de facto* arrest when he was directed to sit in a police cruiser
and subjected to interrogation; (3) his subsequent consent to search the vehicle was not
voluntary because he was coerced by law enforcement; (4) his statements were taken in
violation of the Fifth Amendment; and (5) the government should be precluded from
introducing statements, testimony, and reports by law enforcement because an audio
recording of the traffic stop was not created.  The government opposes the motion,
arguing that the traffic stop itself was lawful and Defendant's further detention was
reasonable, that Defendant does not have standing to contest the search of the vehicle,

and that any failure to record the traffic stop was inadvertent and not grounds for suppression.

The government is represented by Assistant United States Attorney Gregory L. Waples. Defendant is represented by Federal Public Defender Michael L. Desautels.

I.    **Findings of Fact.**

On April 23, 2015 at approximately 1:46 p.m., Trooper Matthew Steeves of the Vermont State Police ("VSP") was observing northbound traffic on Interstate 91 in a marked police cruiser located in a U-turn. He observed a vehicle traveling at a high rate of speed and using radar, determined that the vehicle's speed was ninety-seven miles per hour in an area with a posted speed limit of sixty-five miles per hour. He activated his cruiser lights and began pursuing the vehicle. The vehicle, a silver Dodge Charger with New York license plates, immediately left the passing lane, moved into the travel lane, and stopped partially in the roadway. Using his public address system, Trooper Steeves ordered the operator to move over to the breakdown lane so as not to create a traffic hazard. The operator complied with this order.

Trooper Steeves exited his cruiser and approached the vehicle. In doing so, he noted that the vehicle was a rental vehicle as evidenced by the bar code in its rear window. Trooper Steeves approached the passenger side of the vehicle for safety reasons.[1] Trooper Steeves noticed that all four windows of the vehicle were down and he immediately smelled a strong odor of fresh burnt marijuana.

Defendant, the operator and sole occupant of the vehicle, had his license and the vehicle's registration in his hand when Trooper Steeves approached. He identified himself and presented Trooper Steeves with a Pennsylvania license. Trooper Steeves asked Defendant why he had initially stopped in the roadway. Defendant responded that when he saw Trooper Steeves pull out, he knew that he was going to be stopped. Defendant further advised that he was coming from Brooklyn and traveling to a mall in

---

[1] Trooper Steeves testified that his height is 6'4". The video recording of the traffic stop depicts him crouching down to see into the passenger side window and at times putting his hands on his hip where his firearm was holstered.

New Hampshire to buy a shirt. When Trooper Steeves questioned why Defendant would travel such a long distance for a shirt, Defendant replied that he was actually going to see a woman he met on Facebook. Defendant advised that he did not have any luggage in the vehicle because he was just going to take a trip "up and back."

Trooper Steeves saw what appeared to be marijuana flake on the carpet in the passenger foot well and streaks of what appeared to be marijuana flake on the passenger seat. He subsequently photographed the alleged marijuana flake. Trooper Steeves did not see any paraphernalia associated with marijuana in the vehicle, nor did he test the alleged marijuana flake or preserve it for evidentiary purposes. He conceded that he would not have arrested Defendant on the basis of the marijuana he saw in the vehicle. Trooper Steeves asked about marijuana in the vehicle, and Defendant responded that he did not have or use marijuana. Defendant also advised Trooper Steeves that the silver Dodge Charger was not his vehicle, but a rental vehicle that he had borrowed from his friend "Kevin." Trooper Steeves asked Defendant to provide him with a copy of the rental agreement and Defendant did so. The rental agreement stated that other than Kevin Pierre-Louis, there were no additional authorized drivers.

Trooper Steeves told Defendant that he would like to search the vehicle and advised Defendant that he could consent to the search or require Trooper Steeves to apply for a search warrant. When Defendant responded that he needed to talk to Kevin first, Trooper Steeves permitted Defendant to make a cell phone call. While Defendant was speaking on his cell phone, Trooper Steeves radioed for another unit to respond to the scene of the traffic stop.

After speaking with Kevin, Defendant advised that he did not want Trooper Steeves to search the vehicle. Trooper Steeves responded that they would need to tow the vehicle and request a search warrant. At this point, VSP Trooper Daniel Bennett arrived on the scene.[2] As he approached the silver Dodge Charger on the operator's side,

---

[2] Trooper Steeves credibly testified that, on the day in question, his cruiser cam audio was inoperable which he discovered only after the fact. Nonetheless, the entire stop is captured on video and a portion of the stop is captured on Trooper Bennett's cruiser cam audio recorder.

Trooper Bennett also detected the odor of burnt marijuana and saw what appeared to be marijuana flake in the foot well of the passenger side of the vehicle. Trooper Bennett recorded this observation on his body microphone.

Trooper Steeves asked if Defendant would exit the vehicle and consent to a search of his person and advised him that he could refuse this request. After obtaining Defendant's consent, Trooper Steeves searched him, and determined that Defendant had two wallets and three cell phones on his person, which did not immediately appear to be of interest. Trooper Steeves then asked Defendant to sit in the front seat of his cruiser while he ran his information. Other than searching Defendant, Trooper Steeves never touched Defendant or made any show of force prior to arresting him.

At Trooper Steeves's direction, Defendant sat in the front seat of the police cruiser without handcuffs or other restraints while Trooper Steeves ran his license and the vehicle's registration. Trooper Steeves advised Defendant that the odor of marijuana and the marijuana flake gave him probable cause to seize the vehicle and he read a consent card to Defendant to advise him of his options. Defendant again asked to call Kevin, which Trooper Steeves permitted. After calling and speaking to Kevin a second time, Defendant consented to a search of the vehicle. At approximately 2:17 p.m., Defendant read a written consent card and signed it. The consent card states as follows:

> I Trooper Steeves believe that I have probable cause to seize [a] 2015 NY GXM5610 Dodge Charger here under your control. I will be attempting to obtain a search warrant from a judge. You may choose to allow a search now or you may require that I attempt to obtain a search warrant from a judge. **The choice is yours.**
>
> I freely give my permission to Trooper Steeves to conduct a complete search of the items listed above and their contents. I understand I do not have to allow this. No threats or promises have forced this consent.

Government's Exhibit 4.

While Trooper Steeves searched the Dodge Charger, Defendant was left in the cruiser with Trooper Bennett. Defendant advised Trooper Bennett that he thought he was in New Hampshire and that he planning to visit a woman in that state that he had met on Facebook. Defendant was laughing during a portion of this conversation and was

4

removing items from his pocket. Trooper Bennett also did not touch Defendant or make any show of force. His conversation with Defendant was casual in tone and content and Defendant initiated some of the topics of conversation.

During the search of the Dodge Charger, Trooper Steeves located thirty-five credit cards for "Kenneth Reid" and "Jennifer Alvarez" and five identification cards or operator's licenses purportedly issued by Texas, Pennsylvania, New York, and California. The cards had different names on each of them and each bore Defendant's photograph. Thereafter, Trooper Steeves placed Defendant in handcuffs and advised him that he was doing so because Defendant was not being truthful about his identity.

Trooper Steeves completed his search and arrested Defendant. He then transported Defendant to a VSP barracks and permitted Defendant to call his Pennsylvania attorney. Following that conversation, Defendant advised that he did not wish to talk to Trooper Steeves. Trooper Steeves nonetheless requested Defendant's permission to search his wallets. Defendant consented to a search of his brown wallet, but not his black wallet. Defendant signed a written consent form for the brown wallet, and Trooper Steeves subsequently sought and obtained a search warrant for the black wallet. The search of the black wallet yielded additional allegedly counterfeit credit cards and a false identification card.

At Defendant's request and with the government's consent, the court continued its evidentiary hearing so that Defendant could present the testimony of Mr. Pierre-Louis by videoconference from his location in Brooklyn, New York. Mr. Pierre-Louis identified himself as Defendant's friend from high school and testified that the two speak on the phone daily or every other day and see each other often.

In April of 2015, Mr. Pierre-Louis rented a silver Dodge Charger from Enterprise Rental Car Company ("Enterprise") for a rental period starting on April 15, 2015 and expiring on April 22, 2015 because his personal vehicle was being repaired. Mr. Pierre-Louis credibly testified that on the morning of April 23, 2015, Defendant called him and asked to borrow his vehicle. According to Mr. Pierre-Louis, Defendant did not tell him why he wanted to borrow the vehicle or advise that he intended to travel to Vermont that

5

day. Mr. Pierre-Louis testified that he did not ask for this information. Mr. Pierre-Louis was aware that Defendant had his own vehicle at the time, but he did not ask him why he was not using it. In the past, he had allowed Defendant to use his personal vehicle, but he had never previously allowed Defendant to use a vehicle rented in his name. Because Mr. Pierre-Louis had previously rented vehicles from Enterprise, he was aware that he could not permit someone else to drive the Dodge Charger without notifying Enterprise of that fact. Mr. Pierre-Louis did not allow any other individual to drive the Dodge Charger. In light of these facts, the court finds Mr. Pierre-Louis's testimony that he permitted Defendant to borrow the Dodge Charger without any discussion of its intended use not credible.

Mr. Pierre-Louis previously kept rental vehicles from Enterprise beyond the termination date of the rental agreement and knew that Enterprise would merely charge his credit card for any additional days. He disclaimed any knowledge of the marijuana flake in the Dodge Charger and noted that he had never seen Defendant smoke or possess marijuana. Although Mr. Pierre-Louis claimed passengers that he had transported in the Dodge Charger neither smoked marijuana nor showed marijuana to him, he nonetheless speculated that a passenger was the probable source of the marijuana in the vehicle.

Mr. Pierre-Louis spoke by cell phone to Defendant twice during the traffic stop. In the first call, Defendant advised that he had been pulled over for speeding and "the cop wanted to search the car and do I give permission. He said that he got pulled over doing [ninety-seven] or [ninety] something." (Doc. 30 at 18:18-20.) Defendant advised Mr. Pierre-Louis that "the cops noticed weed on the floor" and asked if Mr. Pierre-Louis gave permission to search the vehicle. Mr. Pierre-Louis told Defendant to consent to a search of the vehicle. In the second cell phone call, Defendant again asked whether Mr. Pierre-Louis consented to a search of the vehicle. In response, Mr. Pierre-Louis stated: "It's fine with me." *Id.* at 20:10.

6-

## II.   Conclusions of Law and Analysis.

### A.   Whether Trooper Steeves Unreasonably Prolonged the Traffic Stop.

Defendant does not challenge the lawfulness of the initial traffic stop based on his excessive speed. He, instead, argues that Trooper Steeves unreasonably prolonged the traffic stop in violation of the Fourth Amendment, and that the traffic stop ripened into a *de facto* arrest without probable cause when Trooper Steeves directed him to exit his vehicle and sit in his police cruiser. As the vehicle's operator, Defendant was "seized within the meaning of the Fourth Amendment[,]" and thus "may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007).

A traffic stop "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns[.]" *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). Tasks such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are within the scope of a traffic stop. *Id.* at 1615; *see also United States v. Long*, 320 F.3d 795, 799 (8th Cir. 2003) (ruling that "[a]n officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip."). Measures "aimed at detect[ing] evidence of ordinary criminal wrongdoing" cannot take place "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1615 (internal quotation marks omitted).

Under federal law, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977); *see also Mollica v. Volker*, 229

7

F.3d 366, 369 (2d Cir. 2000) ("[I]f a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle."). Thereafter, directing a motorist to sit in a police cruiser "does not elevate the detention beyond a *Terry* stop." *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004).

By asking Defendant for consent to search the vehicle, Trooper Steeves lengthened the duration of the traffic stop beyond the time necessary to issue a ticket or citation for Defendant's excessive speed. For this further detention to be lawful, the police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion [upon an individual's Fourth Amendment rights]." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "[C]ourts consider (1) whether the officer's action was justified at its inception; and (2) 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *United States v. Foreste*, 780 F.3d 518, 526 (2d Cir. 2015) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "While [an] officer may not rely on an inchoate and unparticularized suspicion or hunch, . . . he is entitled to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (internal quotation marks and citation omitted).

The court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "In the case of a suspected drug transaction . . . the reasonable suspicion inquiry must ask if 'the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer.'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal citation omitted). "[T]he amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and

8

'considerably less than proof of wrongdoing by a preponderance of the evidence.'"
*Padilla*, 548 F.3d at 186-87 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Defendant concedes that Trooper Steeves's stop of the vehicle was lawful at its
inception. Under 23 V.S.A. § 1097, it is a misdemeanor to operate a motor vehicle "at
least [thirty] miles per hour in excess of a state speed zone or local speed limit." Indeed,
because Trooper Steeves observed Defendant traveling thirty-two miles per hour over the
posted speed limit, he had probable cause to arrest Defendant for committing a
misdemeanor in his presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354
(2001) ("If an officer has probable cause to believe that an individual has committed even
a very minor criminal offense in his presence, he may, without violating the Fourth
Amendment, arrest the offender.").[3]

Thereafter, Trooper Steeves credibly testified that a number of additional objective
facts made him suspect that Defendant was engaged in other criminal activity. When he
approached the vehicle, Trooper Steeves noticed that all four windows were down, and
he immediately detected a strong odor of fresh burnt marijuana. *See United States v.
White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (noting that "the smell of marijuana alone
may provide a basis for reasonable suspicion for further investigation of possible criminal
conduct"); *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (observing that "the
smell of marijuana alone, if articulable and particularized, may establish not merely
reasonable suspicion, but probable cause."). "When an officer encounters the smell of
raw marijuana, there is the fair probability that the vehicle is being used to transport
marijuana and that the marijuana has been secreted in places other than the passenger
compartment." *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001)
(internal quotation marks omitted). In addition, Trooper Steeves observed marijuana
flake in the passenger foot well and what appeared to be streaks of marijuana flake on the
passenger seat. Based on these articulable facts, Trooper Steeves had probable cause to

---

[3] *See also* Vt. R. Crim. P. 3(b) ("A law enforcement officer may arrest without a warrant a
person whom the officer has probable cause to believe has committed or is committing a
misdemeanor in the presence of the officer. Such an arrest shall be made while the crime is
being committed or without unreasonable delay.").

search the vehicle under the automobile exception to the Fourth Amendment. *See United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir. 2004) (concluding that law enforcement may conduct a warrantless search of a vehicle "if probable cause exists to believe the vehicle contains contraband or other evidence of a crime.").

Trooper Steeves further noted that Defendant was operating a rental car. *See United States v. Avezov,* 731 F. Supp. 2d 1194, 1204 (N.D. Okla. 2010) (noting that "[t]he status of a vehicle as a [rental] can be considered a factor to support the existence of reasonable suspicion, because it is accepted that drug traffickers frequently use rental vehicles to transport illegal drugs."). Defendant was able to produce the rental agreement, but was not listed as an authorized driver therein. When Trooper Steeves inquired about Defendant's itinerary, Defendant provided a series of contradictory responses which rendered the purpose of his trip implausible. *See United States v. Contreras,* 506 F.3d 1031, 1036 (10th Cir. 2007) (observing that "implausible travel plans can form a basis for reasonable suspicion."); *United States v. Hooper,* 935 F.2d 484, 494 (2d Cir. 1991) (concluding that "confused and contradictory responses" to officers' questions combined with nervous demeanor and lack of identification gave rise to reasonable suspicion of criminal activity). These facts gave rise to further indicia of potential criminal activity.

Based on the totality of the circumstances, Trooper Steeves had a reasonable, articulable suspicion that someone in the vehicle had recently smoked marijuana and that Defendant, as the vehicle's sole occupant, was the likely source of both the odor and presence of marijuana. Although Trooper Steeves did not plan to arrest Defendant for the marijuana flake he initially observed in the vehicle, he had a reasonable suspicion that other contraband may be uncovered if the vehicle was searched. It was therefore reasonable for Trooper Steeves to ask Defendant if he would consent to a search of the vehicle to quickly dispel or confirm that suspicion. *See United States v. Bailey,* 743 F.3d 322, 336 (2d Cir. 2014) ("In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions

quickly.'"). Because the traffic stop in this case was not unreasonably prolonged under the Fourth Amendment, Defendant's motion to suppress on that basis is DENIED.

### B.   Whether Defendant Has Standing under the Fourth Amendment to Challenge the Search of the Rental Vehicle.

Prior to addressing whether Defendant voluntarily consented to the search of the Dodge Charger, the court must determine whether Defendant has standing to contest the constitutionality of the search. As an unauthorized driver of a rental vehicle, the government argues that Defendant does not have standing under the Fourth Amendment to challenge Trooper Steeves's search of the vehicle. Defendant responds that he has standing because he had permission from Mr. Pierre-Louis to drive the Dodge Charger, and because the expiration of the rental agreement did not negate that permission.

Under the Fourth Amendment, only the "victim of an illegal search" has standing to seek suppression of evidence. *See Alderman v. United States*, 394 U.S. 165, 174 (1969). "To contest the validity of a search, a defendant must demonstrate that he *himself* exhibited an actual subjective expectation of privacy in the area searched, and that this subjective expectation is one that society is willing to accept as reasonable." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997). A defendant's "'wrongful' presence at the scene of a search would not enable [him] to object to the legality of the search." *Rakas v. Illinois*, 439 U.S. 128, 141 n.9 (1978) (noting that "several lower courts inexplicably have held that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile."). Accordingly, to contest a vehicle search, a defendant "must show, among other things, a legitimate basis for being in it, such as permission from the owner." *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991).

As Defendant did not testify, there is no direct evidence that he had a subjective expectation of privacy in the rental vehicle. Defendant's mere "possession of the keys [is] not sufficient to give him a constitutionally protected interest in the privacy" of the rental vehicle. *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980). Because Defendant demonstrated a belief that he could not consent to a search of the vehicle

11

without the affirmative permission of Mr. Pierre-Louis, he did not "manifest[] his own subjective intent and desire to maintain privacy[.]" *California v. Ciraolo*, 476 U.S. 207, 211 (1986). This conclusion is underscored by the fact that Defendant maintained no personal possessions in the Dodge Charger and had possession of it only for a limited period of time subject to Mr. Pierre-Louis's express consent.

Assuming *arguendo* that Defendant had demonstrated a subjective expectation of privacy, the court must determine whether any such expectation was objectively reasonable. In general, "[i]t is not the law . . . that only the owner of a vehicle may have a Fourth Amendment privacy interest therein that is protected against governmental invasion. Rather, the borrower of an automobile can possess such an interest." *United States v. Pena*, 961 F.2d 333, 337 (2d Cir. 1992). The Second Circuit, however, has not squarely addressed whether an individual who is not authorized to operate a vehicle under a rental agreement has an objectively reasonable expectation of privacy in it, and there is a split of authority on this issue.[4] *See United States v. Haywood*, 324 F.3d 514, 516 (7th Cir. 2003) (observing that "we held that an authorized driver of a rental car has standing to challenge a search of the car, but we have not addressed the question with

---

[4] The weight of district court decisions in the Second Circuit is that an unauthorized driver does not have a reasonable expectation of privacy in a rental vehicle. *See, e.g., United States v. Van Praagh*, 2014 WL 4954162, at *3 (S.D.N.Y. Oct. 1, 2014) ("If the vehicle is a rental car . . . a defendant generally does not have a legitimate expectation of privacy in the car if he is 'not listed on the rental agreement as an authorized driver.' This is true even if the defendant receives permission from the lessee to drive the rental car.") (internal citation omitted); *United States v. Mikelic*, 2011 WL 1837844, at *4 (D. Conn. May 11, 2011) (observing that "[defendant's] name was not on the rental agreement nor was [defendant] an authorized driver of the rental vehicle[,] . . . [t]herefore, [defendant] does not have a reasonable expectation of privacy in the rental car and, thus, does not have standing to challenge the search of the car itself."); *United States v. Taddeo*, 724 F. Supp. 81, 84 (W.D.N.Y. 1989) (concluding that unauthorized driver of rental vehicle lacked standing because he "made no showing that any arrangement had been made with the rental car company that would have allowed him to drive the car legitimately"); *but see United States v. Little*, 945 F. Supp. 79, 83 n.2 (S.D.N.Y. 1996), *aff'd*, 133 F.3d 908 (2d Cir. 1998) (concluding that unauthorized driver of rental vehicle had a "possessory interest in the vehicle" because violation of rental contract "does not rise to the level of criminal conduct, but merely provides grounds for canceling the rental agreement. If the driver is authorized by the lessee to use the vehicle, the driver may legitimately conclude that the car is his during the time he has permission to use it.").

respect to an unauthorized driver. Several circuits have examined that issue, though they have failed to reach a consensus.").

The Fourth and Tenth Circuits cite *Rakas* for the proposition that "one who owns or *lawfully possesses* or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas*, 439 U.S. at 143 n.12 (emphasis supplied). These circuits reason that because an unauthorized operator of a rental vehicle does not have lawful possession of the vehicle, he or she also lacks a legitimate expectation of privacy. *See United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) ("as an unauthorized driver of the rented car, [defendant] had no legitimate privacy interest in the car and, therefore, the search of which he complains cannot have violated his Fourth Amendment rights."); *United States v. Roper*, 918 F.2d 885, 887-88 (10th Cir. 1990) (concluding that because defendant was not listed as an additional driver under the rental contract, "[he] did not have standing to challenge the search of the vehicle he was driving at the time of the stop.").

The Eighth Circuit applies a multi-factor balancing test to determine Fourth Amendment standing:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). Applying these factors to the unauthorized use of a rental vehicle, the Eighth Circuit concluded that a defendant must "present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995).

The Fifth Circuit has addressed this issue twice, applying a multi-factor balancing test similar to that of the Eighth Circuit. In *United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir. 1990), the Fifth Circuit reasoned that because the defendant "took normal precautions to maintain" his privacy and had "the right to exclude others[,]" he possessed

a legitimate expectation of privacy in the cargo hold of a rented truck that he was not authorized to drive. *Id.* at 1038. In *United States v. Boruff*, 909 F.2d 111 (5th Cir. 1990), however, the Fifth Circuit looked to the express terms of the rental agreement and determined that the authorized renter "had no authority to give control of the car to [the defendant.]" *Id.* at 117. The court thus concluded that the defendant lacked standing, as he was "well aware of these restrictions when he took possession of the car and used it during the smuggling operation." *Id.*

While "acknowledg[ing] that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle," the Sixth and Third Circuits also consider whether a defendant possesses a "legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances." *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001); *see also United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011) (concluding that "the driver of a rental car who has been [l]ent the car by the renter, but who is not listed on the rental agreement as an authorized driver, lacks a legitimate expectation of privacy in the car unless there exist extraordinary circumstances suggesting an expectation of privacy."). Applying this standard, the Sixth Circuit reasoned that a defendant who had a business relationship with the rental company and was the spouse of the vehicle's authorized driver had a reasonable expectation of privacy in a rental vehicle he was not authorized to drive. The court concluded "[i]t was not *illegal* for [defendant] to possess or drive the vehicle, it was simply a breach of the contract with the rental company." *Smith*, 263 F.3d at 587.

The Seventh Circuit recently considered whether the sole authorized driver of a rental car had standing under the Fourth Amendment notwithstanding the fact that his operator's license was suspended and that the rental agreement required that he possess a valid license. The court rejected a *per se* rule holding that any violation of the rental agreement would result in lack of standing to challenge a search under the Fourth Amendment:

> Many drivers of rental cars must transgress certain provisions of [the] rental agreement, yet they undoubtedly regard the space inside the car as private

14

> while they possess it.  An ordinary person would not expect his rental car to
> be open to public viewing or police inspection as a result.  Society is
> willing to recognize a privacy interest in a car even if the driver does not
> mind her P's and Q's at all times.

*United States v. Walton*, 763 F.3d 655, 665 (7th Cir. 2014).  The court nonetheless

acknowledged that "[c]ertain violations of a rental agreement may be so egregious that

society would no longer be prepared to respect a privacy interest in the car.  For example,

if the driver kept the vehicle months beyond its return date, it would essentially become

stolen."  *Id.*

Although Defendant operated the Dodge Charger with Mr. Pierre-Louis's

permission and the expiration of the rental agreement did not negate that permission,

several other factors weigh heavily in favor of finding that any expectation of privacy

Defendant had in the vehicle was not objectively reasonable.  Defendant was aware that

the vehicle was a rental vehicle and he did not claim to have any authority from

Enterprise to operate it.  He had no luggage or personal belongings in the vehicle other

than items he kept on his person.  Defendant also made it clear that he could not consent

to a search of the vehicle without first obtaining the authorized renter's permission.

Unlike the defendant in *Smith*, Defendant had no business relationship with Enterprise

pertaining to the vehicle.  *Cf. Smith*, 263 F.3d at 586 (noting that "[defendant] called the

rental company to reserve the vehicle and was given a reservation number.  He provided

the company with his credit card number, and that credit card was subsequently billed for

the rental of the vehicle.").

The "historical use" of the vehicle revealed that this was the sole occasion on

which Mr. Pierre-Louis let anyone borrow it.  Mr. Pierre-Louis was aware that he could

not permit someone else to drive the vehicle without notifying Enterprise and he did not

claim to have conveyed to Defendant any information that would foster Defendant's

reasonable belief that Enterprise had authorized his use.  To the contrary, Defendant was

in possession of a rental agreement that specifically prohibited his operation of the

vehicle.

15

Finally, Defendant was in possession of the vehicle only for a single day for a trip "up and back" from Brooklyn to New Hampshire and his own vehicle remained available. His purported purpose for the trip was either to buy a shirt or meet a woman. There is thus no evidence that Defendant depended on the rental vehicle as a source of transportation, expected to use it for a prolonged period of time, or was operating it for an essential purpose.

Examining the totality of the circumstances, Defendant did not have a privacy interest in the Dodge Charger that society would deem reasonable. *See Rakas*, 439 U.S. at 143 n.12 (noting that when an individual's presence under the circumstances "is wrongful[,] his expectation [of privacy] is not one that society is prepared to recognize as reasonable.") (internal quotation marks omitted); *see also Kennedy*, 638 F.3d at 165 (observing that an unauthorized operator of a rental vehicle "not only acts in contravention of the owner's property rights, but also deceives the owner of the vehicle"). Because Defendant does not have standing under the Fourth Amendment to contest the search of the Dodge Charger, his motion to suppress on that basis is DENIED.

## C.    Whether Defendant Voluntarily Gave Consent to Search the Vehicle.

Notwithstanding the court's conclusion that Defendant lacks standing and the automobile exception applies, the court considers the factors Defendants cites in support of his contention that his consent to search the vehicle was the product of police coercion:

> (1) [t]he trooper told [Defendant] that [he] would have the car towed and [Defendant] held at the station until a search warrant was obtained if [he] did not give consent;[5] (2) the detention went on for a long time; (3) [Defendant] was not the owner and said that he needed the consent of the renter of the vehicle in order to "consent;" (4) throughout the detention, Trooper Steeves leaned on the front passenger side of the vehicle in an intimidating manner; (5) a second trooper was called in and was positioned

---

[5] Defendant proffered no evidence that this statement was made. Moreover, at that juncture, Trooper Steeves had probable cause to arrest Defendant for his violation of 23 V.S.A. § 1097 and thus this statement, if made, was neither inaccurate nor coercive. *See Illinois v. McArthur*, 531 U.S. 326, 334 (2001) ("We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time.").

at the front driver-side door, thus the two troopers were on both sides of [Defendant].

(Doc. 14 at 3.) Consent cannot "be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). "[W]hen, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

"The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64, 76 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2797 (2013) (internal quotation marks and citation omitted). Whether consent is voluntary "is a question of fact determined by a totality of all the circumstances." *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (internal quotation marks omitted). Courts may consider factors such as age, intelligence, experience with the criminal justice system, and whether the defendant was aware of his right to withhold consent in determining voluntariness. *See United States v. Munoz*, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013) (internal quotation marks omitted). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Isiofia*, 370 F.3d at 231 (internal quotation marks omitted).

In this case, Trooper Steeves read a consent card to Defendant which stated that Defendant had the choice of whether to allow the search or require that Trooper Steeves attempt to obtain a search warrant. The consent card stated that Defendant did not have to allow the search and that no threats or promises were made to elicit consent. *See United States v. Zamoran-Coronel*, 231 F.3d 466, 470 (8th Cir. 2000) (noting that whether an officer informs a suspect of their right to refuse consent "constitutes 'a significant, but not determinative, factor' in determining voluntariness."). Trooper Steeves permitted Defendant to call Mr. Pierre-Louis twice to consult him regarding the issue of consent, and Defendant subsequently read the consent card himself and signed it. This is strong evidence of voluntary consent. *See United States v. Schaefer*, 519 F.

App'x 71, 72 (2d Cir. 2013) ("the totality of circumstances supports [the] finding that the refusal could not reasonably be understood to have coerced [the defendant's] subsequent consent to search, particularly as [the defendant's] consent was given in writing on a form that specifically advised him of his right to refuse consent") (internal citations omitted); *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988) ("Execution of a consent form is one factor that indicates that consent was voluntary."); *United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998) ("[t]he consent form, which [defendant] read and which was explained to him before he signed it, gave clear notice of his rights.").

When asked for consent to search the Dodge Charger, Defendant was on a public highway in the daytime in plain view of passersby. *See United States v. Orrego-Fernandez*, 78 F.3d 1497, 1505 (10th Cir. 1996) (considering that "[t]he search was conducted on the shoulder of a public highway in daylight" in determining that consent was voluntary). Neither Trooper Steeves nor Trooper Bennett made any show of force, and Defendant was not subjected to any form of physical restraint prior to signing the consent card. *See United States v. Zaleski*, 559 F. Supp. 2d 178, 186-87 (D. Conn. 2008) (concluding that the surrounding circumstances were not sufficiently coercive as to render consent to search involuntary where defendant "was not handcuffed prior to giving consent[,]" and the "officers did not draw their guns . . . [or] make any threats or use physical force."). Courts have held that consent to search may be voluntary in circumstances that are "considerably more coercive in nature" than those at issue here. *Id.* at 187; *see, e.g., United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) (noting that "a finding of coercion [does not] follow from the fact that [defendant] was handcuffed."); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) ("That [defendant] was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion").

Finally, an officer's statement that he will attempt to obtain a search warrant does not negate the voluntariness of consent if there is a good faith belief that a warrant will be obtained. *See United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) ("the well

founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion."). This is especially true where, as here, the officer states that he will "apply for" a warrant. *See id.* at 497 ("The agent can always be on the safe side of the line by plainly indicating that he will apply for a warrant and believes one will be issued") (Newman, J., concurring); *United States v. Raines*, 536 F.2d 796, 801 (8th Cir. 1976) (observing that agent's statement "that a warrant would be applied for . . . was not impermissibly coercive"). Based on the totality of the circumstances, the government has met its burden of proving that Defendant's consent to the search of the Dodge Charger was voluntary.

### D.    Whether Defendant's Roadside Statements Were Obtained in Violation of the Fifth Amendment.

Defendant asserts that he was "in custody" because he was directed to sit in Trooper Steeves's police cruiser and that he was thereafter subject to "interrogation" without *Miranda* warnings. On that basis, he argues that any statements made by him in the cruiser should be suppressed as being taken in violation of the Fifth Amendment. The government responds that Defendant was not in custody at any point during the traffic stop prior to his formal arrest.

Ordinarily, "persons temporarily detained pursuant to [*Terry*] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). This remains true even if the person cannot "disobey a directive to pull over or leave the scene of a traffic stop without being told they might do so." *Id.* at 436. As the Supreme Court has explained, "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Id.* at 437 (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." *Id.* "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 438. The Court noted that the typical traffic stop takes place in public and the motorist is usually "confronted by one or at most two policemen" so that the "atmosphere surrounding an ordinary traffic stop is

19

substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*, itself, and in the subsequent cases in which [the Court] ha[s] applied *Miranda*." *Id.* at 438-39 (internal citation omitted). However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

The question of "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). The analysis begins "by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). If, however, "a reasonable person would not have thought himself free to leave," the court must determine whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* An individual is in custody for purposes of *Miranda* "[o]nly if the answer to this second question is yes." *Id.* In conducting this inquiry, the court must consider "all of the circumstances surrounding the interrogation[.]" *J.D.B.*, 131 S. Ct. at 2397 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)).

> Those circumstances include, *inter alia*, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[.]

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011).

It is undisputed that Defendant was directed to sit in a police cruiser while Trooper Steeves checked his license and registration. Although this was an unequivocal police directive, it does not, alone, "elevate [his] detention beyond a *Terry* stop." *Flowers*, 359 F.3d at 30; *see also Haynie v. Cty. of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003)

("placing a person in a patrol car is not necessarily an arrest"); *but see United States v. Valentine*, 657 F. Supp. 2d 388, 391 (W.D.N.Y. 2009) ("[t]he mere fact that [defendant] was not physically forced into the [police] vehicle does not mean that he could reasonably have believed that he had much choice in the matter."); *United States v. Gallardo*, 2006 WL 680890, at *5 (D. Neb. Mar. 13, 2006) (observing that "the fact that the trooper's conversation with the defendant occurred inside the trooper's patrol car weighs in favor of a finding that the atmosphere was police dominated.") (internal quotation marks omitted).

Once inside the police cruiser, Defendant sat in the front passenger seat, unrestrained, and was permitted to use his cell phone and access his pockets. Although Trooper Steeves explained that he believed that he had probable cause to search the vehicle, he advised Defendant of his options and sought and obtained his written consent. Defendant was not subjected to a lengthy interrogation about his involvement in criminal activity, nor is there any evidence that he spoke against his will. *See Berkemer*, 468 U.S. at 439 ("the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.").

When Trooper Steeves left to search the rental vehicle, Trooper Bennett sat in the police cruiser with Defendant and the two engaged in casual conversation with Defendant initiating several topics of conversation and laughing at times. Trooper Bennett, whose conversation with Defendant was recorded, did not interrogate him about the marijuana or any other criminal activity.

The traffic stop was relatively brief, occurred during the day, and took place on a busy public highway so that any potential police abuse was visible to passing motorists. *See id.* at 438 ("[T]he typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view . . . diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse.").

Prior to his arrest, Defendant was never confronted by both Troopers at the same time, the Troopers never raised their voices at him, and Trooper Steeves's questions were relatively brief in duration and directed to Defendant's itinerary, his identification, and the reasons for Trooper Steeves's request to search the vehicle. The totality of the circumstances therefore support a conclusion that Defendant's detention remained "more analogous to a so-called *Terry* stop, than to a formal arrest." *Id.* at 439 (internal citations omitted).

Even if a reasonable person in Defendant's circumstance would not feel free to leave, the court cannot further find that Defendant's "freedom of action [was] curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672. Prior to his arrest, Defendant was not placed in handcuffs or other restraints. *See id.* at 676 (observing that handcuffs are "generally recognized as a hallmark of a formal arrest."). He was not subjected to any physical force, displays of force, or threats of force. He was neither threatened with an arrest, nor did the Troopers convey the impression that Defendant's arrest was a foregone conclusion. The court therefore concludes "that [Defendant] was not taken into custody for the purposes of *Miranda* until [police] arrested him." *Berkemer*, 468 U.S. at 442. For this reason, Defendant's motion to suppress his roadside statements based on a violation of his Fifth Amendment right to *Miranda* warnings is hereby DENIED.

### E. Whether Defendant's Consent to Search the Brown Wallet Was Obtained in Violation of the Fifth Amendment.

To the extent that Defendant argues that his consent to search his brown wallet was obtained in violation of the Fifth Amendment because his consent was obtained after he advised that he did not wish to speak to Trooper Steeves, that argument fails as well. It is axiomatic that when an individual subjected to custodial interrogation requests counsel, he or she "is not subject to further interrogation by the authorities until counsel has been made available[]to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Asking for consent to search, however, does not constitute

22

interrogation.  *See Faruolo*, 506 F.2d at 495 (concluding that *Miranda* warnings were not required to grant consent to search, "since the consent to search is not 'evidence of a testimonial or communicative nature.'") (quoting *Schmerber v. California*, 384 U.S. 757, 761 (1966)).[6]

### F.     Whether the Failure to Record Audio from the Traffic Stop Warrants Preclusion of Testimony, Reports, and Statements by Trooper Steeves.

Finally, Defendant seeks suppression of testimony, reports, and statements by Trooper Steeves because the audio on his cruiser cam was not functioning at the time of the stop.  Although he makes no allegation that Trooper Steeves acted in bad faith, Defendant argues that without a more cogent explanation from the government, this evidence should be deemed inadmissible under Fed. R. Crim. P. 16(d)(2)(C).[7] Essentially, he asserts that law enforcement has an affirmative duty to create evidence through an audio recording of a traffic stop, and that the failure to do so is grounds for suppression.  However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Defendant alternatively argues that the government has not shown that it followed "reasonable bounds" to preserve the audio portions of the stop.  (Doc. 14 at 10.) Although the government has a duty to preserve material evidence in its possession, *see California v. Trombetta*, 467 U.S. 479, 488 (1984) (limiting evidence that states are constitutionally required to preserve to that which is "expected to play a significant role in the suspect's defense"), law enforcement is under no obligation to record a criminal defendant's statements.  *See United States v. Owden*, 345 F. App'x 448, 457 (11th Cir. 2009) ("the government was under no obligation to video the events at all"); *United*

---

[6] *See also United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994) (concluding that because "requesting consent to search is not likely to elicit an incriminating statement, such questioning is not interrogation"); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993) ("We hold that a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address.").

[7] Under Rule 16(d)(2)(C), the court may sanction noncompliance with a discovery order by prohibiting the introduction of undisclosed evidence.

*States v. Weisz*, 718 F.2d 413, 436 (D.C. Cir. 1983) (concluding that law enforcement is "under no duty to 'preserve' its conversations with [criminal defendants] by recording or otherwise memorializing them."). Indeed, until recently, federal law enforcement agencies "rarely recorded custodial interviews." *See Department of Justice Institutes Presumption that Agents Will Electronically Record Custodial Interviews*, 128 Harv. L. Rev. 1552, 1552 (2015).

Although Defendant suggests that the audio recording of the stop may have included statements that may exculpate him and are material to his defense, he was free to dispute Trooper Steeves's account of what happened with his own testimony but did not do so. Defendant thus offers only "[m]ere speculation that some exculpatory material may have been withheld[,]" which is insufficient to substantiate a *Brady* violation. *Strickler v. Greene*, 527 U.S. 263, 286 (1999).[8]

The primary rationale for the extraordinary remedy of suppressing otherwise relevant evidence in criminal cases is "to deter illegal conduct by Government officials[.]" *United States v. Payner*, 447 U.S. 727, 744 (1980). Trooper Steeves credibly testified that his failure to ensure that his cruiser cam audio was functioning was an inadvertent mistake on his part. Because excluding his testimony, reports, and statements would do nothing to deter police misconduct, no sanction is warranted. Accordingly, Defendant's motion to suppress on this basis is DENIED.

---

[8] It is well settled that "suppression by the prosecution of evidence favorable to an accused upon request violates due process[.]" *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "*Brady* requires that the government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress physical evidence and statements (Doc. 14).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___19th___ day of January, 2016.

Christina Reiss, Chief Judge
United States District Court